**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| AngioDynamics, Inc.,<br><br>                                   Plaintiff,<br><br>                       v.<br><br>Endovascular Engineering, Inc.,<br><br>                                   Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff AngioDynamics, Inc. ("Angio" or "Plaintiff") brings this Complaint against Defendant Endovascular Engineering, Inc. ("E2" or "Defendant") and alleges as follows:

**NATURE OF THE ACTION**

1.      This case is about E2's failure to respect Angio's patents, which reflect the years of development undertaken to design and commercialize cutting-edge thrombectomy technology that revolutionizes how life-threatening blood clots are removed from the body and drastically improves patient health and outcomes.

2.      Since its founding in 1988 in Queensbury, New York, Angio has focused on designing and delivering high-quality medical products for minimally invasive procedures and oncology. One of Angio's core strengths is catheters—narrow, tubular medical devices that are inserted into blood vessels, body cavities, and ducts to treat diseases. Catheters, which are a type of cannula, are keystones of minimally invasive medical procedures because they can be guided to otherwise difficult to reach areas of the body by accessing the bloodstream via tiny incisions in

-1-

the skin. Many of Angio's most important and successful innovations use catheters to treat diseases that would otherwise be addressed with highly intrusive procedures.

3.    Angio's focus on quality and patient outcomes has led to tremendous success. In 2004, Forbes named Angio one of the 200 Best Small Companies in America. That same year, Angio became a public company, listing on Nasdaq. Further growth followed, leading to the diversified products Angio sells today, which have been used by millions of patients to treat a variety of life-threatening diseases.

4.    Since its founding, Angio has continually expanded its product offerings by reinvesting in research and development and by identifying nascent technologies that would benefit from Angio's MedTech expertise and product development infrastructure. These efforts have involved close collaborations with leading clinicians and researchers, allowing Angio to identify treatment areas that would benefit from its focus on minimally invasive procedures. The result: a continually expanding portfolio of high-quality medical devices that provides treatment options on the leading edge of medicine.

5.    Two such medical devices are the AngioVac System (the "AngioVac") and the AlphaVac System (the "AlphaVac")—FDA-approved thrombectomy systems for removing blood clots (thrombi and emboli) from the veins of patients. These devices have shifted the paradigm for treating blood clot-related diseases because they provide minimally invasive alternatives to traditional surgical procedures.

6.    While Angio's technology is broadly applicable to a variety of blood clot-related diseases, it has revolutionized the treatment of pulmonary embolism (PE). This condition, which has an untreated mortality rate as high as 30%, is the third leading cause of cardiovascular mortality.

7.      While the disease is bad enough, the previously standard treatment for PE—open heart surgery—was often worse. This highly invasive procedure involves bisecting the breastbone and spreading apart the ribs to access the heart and lungs. Even if the surgery is successful, patients then face months of rehabilitation and a significant risk of post-surgery mortality.

8.      The AngioVac and AlphaVac transcend these problems by leveraging the strengths of catheters, one of Angio's core competencies, and outside-the-box thinking. Instead of relying on bone saws, rib spreaders, and a deft surgeon's touch, doctors using the AngioVac and AlphaVac only need to make small incisions in the skin—smaller than the length of a grain of rice—to access the patient's blood stream, insert a carefully-designed catheter, and remove the life-threatening clot.

9.      The AngioVac and AlphaVac are exactly what they sound like: specialized catheters that vacuum up blood clots before they dislodge and cause harm or death. Their mechanism of action is ingenious. A catheter with an expandable funnel at its distal end is inserted into the vasculature via a small incision in the skin. The funnel is initially in a compressed state as it is inserted and navigated to the target area. Once in position, the funnel is expanded, providing a larger area for sucking out the blood clot via aspiration:



Cannula tip in sheath          Cannula engaging thrombus          Cannula aspirating thrombus

10.    The impact on patient health and outcomes is revolutionary. As explained by UCLA Health, "AngioVac is a game changer for us in treating people who previously had few or no options other than open-heart surgery."[1] One patient treated at Reagan UCLA Medical Center, for example, had his blood clot removed during a three hour, minimally invasive procedure, followed by a short hospital stay before discharge. If this patient had instead had open-heart surgery, the procedure would have taken twice as long, involved a surgeon dividing the breastbone lengthwise down the middle to access the heart, and resulted in extended rehabilitation and a high risk of post-surgery mortality.[2]

11.    The AngioVac and AlphaVac did not appear overnight or by accident. Their availability to treat patients instead represents the culmination of years of research and development, extensive work with regulatory agencies like the FDA, and a close partnership between front-line clinicians and engineers. That these devices are now available around the nation and across the world reflects the diligent work of pioneering doctors and hundreds of Angio employees and partners for nearly two decades.

12.    Patents also played a critical role in spurring these innovations. Angio backed these products through years of development knowing that the life-saving advancements central to their operation—particularly, Angio's self-expanding funnel technology—would be protected. To date, Angio has been awarded dozens of patents protecting different aspects of its technology.

13.    Enter E2, a startup whose business model depends on the brazen and willful infringement of Angio's patented technology.

---

[1] https://www.uclahealth.org/sites/default/files/documents/CU201402_AngioVacfnl.pdf
[2] https://www.uclahealth.org/medical-services/radiology/patient-stories/minimally-invasive-procedure-remove-blood-clot#:~:text=AngioVac%20Device,discharging%20him%20four%20days%20later.

14.    E2 is commercializing a thrombectomy product called the Hēlo Thrombectomy System ("Hēlo") that, like the AngioVac and AlphaVac, uses a vacuum catheter with a self-expanding funnel tip to remove blood clots. Hēlo has received FDA clearance for the use of Hēlo to treat pulmonary embolisms and the non-surgical removal of emboli and thrombi from peripheral veins.

15.    While Angio has alerted E2 of its infringement via a series of letters— providing E2 with knowledge of Angio's patents and of E2's infringement at least as of 2024— E2 responded with deflections, obfuscations, and delay. All the while, E2's commercialization activities have accelerated.

16.    As E2 reports to investors, "[c]ommercial preparation [is] in progress" and it has 12,000 square feet of office and manufacturing space. E2 also describes itself as a "commercial-stage medical technology company" that is using an $80,000,000 cash infusion to market and sell its infringing product.[3] Indeed, E2 has ramped up its hiring of sales and marketing personnel after receiving the go-ahead from the FDA to begin marketing its product.

17.    Faced with a willful infringer with a singular goal of plowing forward notwithstanding Angio's patents, Angio now sues to stop E2's unlawful acts and for damages and other relief.

18.    This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, including 35 U.S.C. § 271.

---

[3] https://www.prnewswire.com/news-releases/e2-endovascular-engineering-raises-80-million-series-c-to-advance-next-generation-thrombectomy-platform-as-pulmonary-embolism-treatment-evolves-302735353.html. Further, "E2 investor and board member Brian R. Smith, Managing Director at S3 Ventures, publicly endorsed E2's accelerated commercialization efforts, stating that we are truly impressed by E2's next-generation platform technology for VTE and see this as a solution to dramatically scale the mechanical thrombectomy market[.]" *Id.*

19.    E2 has willfully infringed, and continues to willfully infringe, U.S. Patent Nos. 8,613,717; 11,589,880; and 12,496,077 (the "Asserted Patents").

## THE PARTIES

20.    AngioDynamics, Inc. is a Delaware corporation with its principal place of business at 14 Plaza Drive, Latham, NY 12110.

21.    Endovascular Engineering, Inc. is a Delaware corporation with its principal place of business at 3925 Bohannon Dr. STE 300, Menlo Park, California 94025.

## JURISDICTION AND VENUE

22.    Angio's claims arise under federal law. The Court has subject matter jurisdiction over the patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

23.    E2 and Angio are both Delaware corporations. Further, on information and belief, E2 actively recruited participants from Delaware to participate in investigatory studies of Hēlo. Additionally, E2 is in the process of commercializing Hēlo, including on information and belief for patients and medical providers in Delaware, and is actively directing sales and marketing activities to Delaware. The Court thus has personal jurisdiction over E2.

24.    This Court has patent venue over E2 under 28 U.S.C. § 1400(b) because E2 resides in this District.

## THE ASSERTED PATENTS

25.    On April 12, 2011, Dr. Lishan Aklog and Michael Glennon filed Patent Application No. 13/084,694 with the USPTO, now U.S. Patent No. 8,613,717 (the "'717 Patent"). The USPTO duly and legally issued the '717 Patent, after full and fair examination, on December 24, 2013. The '717 Patent is attached as Exhibit 1.

26. The '717 Patent claims priority to Patent Application No. 12/187,121, filed on August 6, 2008, now U.S. Patent No. 8,075,510, and to U.S. Provisional Application No. 61/015,301, filed on December 20, 2007.

27. Dr. Aklog and Mr. Glennon assigned their rights to the inventions in the '717 Patent to Vortex Medical, Inc., which in turn assigned its rights to AngioDynamics, Inc.

28. On July 1, 2019, Dr. Lishan Aklog and Michael Glennon filed Patent Application No. 16/458,529 with the USPTO, now U.S. Patent No. 11,589,880 (the "'880 Patent"). The USPTO duly and legally issued the '880 Patent, after full and fair examination, on February 28, 2023. The '880 Patent is attached as Exhibit 2.

29. The '880 Patent claims priority to Patent Application No. 15/194,990, filed on June 28, 2016, and now U.S. Patent No. 10,383,983; to Patent Application No. 14/250,486, filed on April 11, 2014, now U.S. Patent. No. 9,402,938; to Patent Application No. 13/084,675, filed on April 12, 2011, now U.S. Patent No. 8,734,374; to Patent Application No. 12/187,121, filed on August 6, 2008, now U.S. Patent No. 8,075,510; and to U.S. Provisional Application No. 61/015,301, filed on December 20, 2007.

30. Dr. Aklog and Mr. Glennon assigned their rights to the inventions in the '880 Patent to Vortex Medical, Inc., which in turn assigned its rights to AngioDynamics, Inc.

31. On June 30, 2025, Kevin Swift, Seth Cote, and Mark Girard filed Patent Application No. 19/254,202 with the USPTO, now U.S. Patent No. 12,496,077 (the "'077 Patent"). The USPTO duly and legally issued the '077 Patent, after full and fair examination, on December 16, 2025. The '077 Patent is attached as Exhibit 3.

32. The '077 Patent claims priority to Patent Application No. 19/014,327, filed on January 9, 2025; to Patent Application No. 16/778,657, filed on January 31, 2020, now U.S.

Patent No. 12,318,097; to Patent Application No. 15/295,529, filed on October 17, 2016; and to U.S. Provisional Application No. 62/242,493, filed on October 16, 2015.

33.    Mr. Swift, Mr. Cote, and Mr. Girard assigned their rights to the inventions in the '077 Patent to AngioDynamics, Inc.

34.    AngioDynamics is the owner of all rights, title, and interest in and to the Asserted Patents, and holds the right to take all actions necessary to enforce its rights to the Asserted Patents, including the filing of this patent infringement lawsuit. AngioDynamics also has the right to recover all damages for past, present, and future infringement of the Asserted Patents.

35.    The Asserted Patents are valid and enforceable.

36.    Angio has settled expectations that the patents are valid and enforceable.

37.    E2 is not licensed or otherwise authorized to practice the Asserted Patents.

**THE ACCUSED PRODUCT**

38.    The Accused Product is the Hēlo Thrombectomy System, including individually and collectively the Aspiration Catheter, Agitator, Rotating Hemostatic Valve, Dilator, Audible Flow Indicator, Pump, Blood/Clot Collecting Device, and any other necessary or optional components used with the system, as well as the so-called Viper Cather, Cobra Catheter, and all other names previously applied to the system or any necessary or optional component thereof. The Accused Product has been the subject of at least FDA 510(k) numbers K252956 and K223891, and the products at issue in those filings also comprise the Accused Product.

**FACTUAL BACKGROUND**

**A.    Technology Background**

39.    Angio's "vacuum for veins" technology is deployed in a variety of configurations to meet patient need and physician preference.

-8-

40. The AngioVac System comprises the AngioVac Cannula and Sheath, which is used to bring the expandable funnel to the target site, and the AngioVac Circuit. A mechanical pump creates the aspiration force. To minimize blood loss, the system simultaneously aspirates blood and clot and reinfuses filtered blood into the patient's body:



41. The AlphaVac includes the AlphaVac Handle, which acts as the engine for the system, and the AlphaVac Cannula and Sheath, which comprises a similar self-expanding funnel to the one used with the AngioVac:



42.    Suction is created by pulling the AlphaVac Handle, allowing the clinician precise control over the aspiration process while minimizing blood loss:



43.    Angio's clot-sucking technology produces remarkable results. Below is an actual pulmonary embolism removed from a patient using the AlphaVac:



44.    Both AngioVac and AlphaVac have been cleared by the FDA—and thus deemed safe and effective for treating a variety of blood clot diseases—as per K253106, K212386, K190594, K142607, K142593, K133445, and K092486 (AngioVac), as well as K252509, K240397, K213388, and K211081 (AlphaVac).

45.    Positive clinical data and real-world results have also been reported in leading journals, including the Journal of the Society for Cardiovascular Angiography &

Interventions, Journal of Vascular Surgery Cases, Innovations and Techniques, Seminars in Interventional Radiology, Journal of the American College of Cardiology, and Journal of Vascular and Interventional Radiology, among others. Indeed, the AlphaVac and AngioVac are both subject to dozens of scholarly articles and publications in which the literature highlights several key technical features that set these systems apart from anything else in the marketplace.

46.     Both devices were also subject to several clinical studies including APEX-AV, RAPID Database, REMOVE-IT, PAVE, and APEX-Return. These studies reiterate the clinical excellence of the AngioVac and AlphaVac in treating a variety of blood-clot related diseases, including PE. Further, the APEX-Return study, which is in progress, is focused on the passive reinfusion of blood aspirated with the AlphaVac.

47.     The devices are also in widespread use at leading medical institutions.

48.     As with many game-changing innovations, a longstanding problem and a refusal to accept the status quo set into motion the course of events leading to the AngioVac and AlphaVac. Nearly two decades ago, Dr. Lishan Aklog—then a newly minted first-year attending cardiac surgeon at Brigham and Women's Hospital—recognized that patient mortality was unacceptably high for traditional pulmonary embolism procedures. These procedures were crude, highly invasive, and often caused more damage than they fixed.

49.     Believing that he could do better, Dr. Aklog had the insight that applying suction power to a catheter with an expandable, deployable funnel would increase the precision of blood clot removal and reduce associated complications.



**Dr. Aklog (l) speaking at the 2025 Cardiovascular Scientific Forum**

50.     This stroke of brilliance led to an initial prototype, which Dr. Aklog created with his partner, Michael J. Glennon, who helped refine and improve upon the original idea. It also led to a small start-up, Vortex Medical, Inc. ("Vortex Medical"), which Dr. Aklog and Mr. Glennon named after the effect produced by the clot-sucking funnel.

51.     Angio—at this point an experienced company with a track record of successfully launching medical devices—recognized that its MedTech expertise could take Dr. Aklog and Mr. Glennon's device to the next level. This led to Angio's purchase of Vortex Medical and the successful commercialization of the first version of the AngioVac.

52.     Angio's expertise supercharged the development of the technology. Building on the success of the AngioVac's original design, biomedical R&D engineers Mark Girard, Kevin Swift, and Seth Cote implemented various improvements to make the technology better, safer, and more reliable. One such improvement is the self-expanding funnel used today, which replaced the balloon-actuated funnel in the original devices.

-12-

53.     The current version of the AngioVac—reflecting improvements from over a decade of clinical use and testing—incorporates the latest version of Angio's technology, including the most advanced self-expandable funnel. The AlphaVac, which applies the AngioVac's core technology in a hand pump configuration, likewise incorporates Angio's most advanced thrombectomy technology, including the same self-expandable funnel.

54.     Thanks to this successful collaboration between pioneering clinicians and leading biomedical engineers, the AngioVac and AlphaVac have been used safely and effectively in thousands of procedures, with clinicians reporting drastically lower patient mortality and improved patient outcomes relative to the prior baseline.

55.     The innovation, R&D, and clinical approval processes for both the AngioVac and AlphaVac took years, millions of dollars, and the work of hundreds of dedicated employees and partners.

56.     But the story has not ended with the current versions of the AngioVac and AlphaVac. Angio continues to invest in and improve these devices, and its dedicated team of engineers and clinical partners is hard at work making these devices better than ever before.

**B.      E2 and Its Infringing Activities**

57.     E2 is a late-stage start-up run by a team of MedTech veterans, including CEO Dan Rose, COO Mike Rosenthal, CTO Scott Baron and CFO Justin Farry. In pitch materials, E2's management tout their history as senior employees at leading medical device companies and their knowledge of the industry.



58.     E2 is also backed by leading venture capital firms and recently announced a Series C funding round of $80,000,000, on top of a prior Series B funding round of $42,000,000 in 2025. This $80,000,000 cash infusion appears earmarked for commercializing Hēlo.

59.     E2 is a sophisticated company run by experienced people and backed by deep pockets. E2 also has its own patents. It should thus understand the role patents serve in spurring innovation—leading to the life-changing medical devices available to patients today—and the importance of respecting patent rights.

60.     Nevertheless, E2's infringement of Angio's patents is blatant, abundant, and willful. Indeed, E2 has slavishly copied Angio's design, including Angio's self-expanding funnel technology:






**Mike Rosenthal speaking at LSI USA '24**

61.    No other competitor to Angio in the thrombectomy market has a catheter product with a self-expanding funnel for aspirating thrombi and emboli. Angio's funnel technology provides it with a distinct competitive advantage, and by copying this aspect of Angio's devices, E2 will divert sales and harm Angio's ability to grow its market share.

62.    Ignorance of Angio's patented technology is no excuse. Starting in March 2024, Angio wrote E2 a series of letters alerting E2 to its infringement of Angio's patent portfolio, including the Asserted Patents. These letters also included claim charts detailing how several features of the Hēlo Thrombectomy System infringe Angio's patents.

63.    On LinkedIn, E2 has also identified its product (via the 👋 emoji in the comment below) as a "composite of elements" from other companies' designs. One of these copied elements is the self-expanding funnel catheter of the AlphaVac:



Multiple high-ranking E2 employees have endorsed the comment, apparently approving of

E2's decision to leverage the innovations of competitors like Angio:



64.    E2 is also actively monitoring Angio's patent and trademark filings. For example, E2's own patents and applications cite Angio's earlier patents as prior art.

65.    E2's responses to Angio's letters, largely through counsel, have not been constructive. Beyond claiming the existence of invalidity and noninfringement positions it refused to share, E2 primarily leaned into the statutory safe harbor provided by 35 U.S.C. § 271(e)(1)—an exception that excuses otherwise infringing actions "solely for uses reasonably related" to regulatory submissions.

66.    The basis for E2's assertion is its ENGULF clinical trial, which was designed to gather clinical data on the use of Hēlo to treat pulmonary embolisms to support E2's 510(k) submission with a specific indication for pulmonary embolism.

67.    However, E2 reported the results of its ENGULF study at the VIVA conference back in November 2025.

68.    Further, it has already gathered the clinical data needed for regulatory approval. On December 18, 2025, the FDA cleared Hēlo for the non-surgical removal of emboli and thrombi, including specifically "for the treatment of pulmonary embolism," as per K252956. This pulmonary embolism specific indication is in addition to a general indication that E2 received for "the non-surgical removal of thrombi and emboli from venous vasculature" as per K223891. And by all accounts, as of April 2026 E2 is now "commercial-stage."[4]

69.    Now that E2 has received its FDA clearance with a specific indication for pulmonary embolism, it is focusing on product launch.

70.    When bringing on CFO Justin Farry, CEO Dan Rose touted his "MedTech experience," explaining it "is instrumental as we prepare thoughtfully for commercialization of our Hēlo™ Thrombectomy System."[5]

71.    E2 has made several recent sales and marketing hires, including Nick Heinze as a Regional Sales Director, Gabby Romano as Marketing Manager, Shane Johnson as Senior Vice President of Sales, Rebecca Slater as Director of Medical Education, and Lee Pusateri as Vice President of Marketing, for example:

---

[4] https://evtoday.com/news/commercialization-of-e2s-helo-thrombectomy-platform-for-pe-supported-by-new-financing

[5] https://www.prnewswire.com/news-releases/e2-endovascular-engineering-inc-appoints-justin-farry-as-chief-financial-officer-to-support-next-phase-of-growth-302541778.html









72.     E2 has also onboarded new personnel to "scale" its "manufacturing capabilities":



73.    In pitch materials, E2 also boasts that "[c]ommercial preparation [is] in progress," and that it has 12,000 square feet of office and manufacturing space in California.

74.    E2 also indicates in press releases that Hēlo is on "sale" to "or on the order of a physician":[6]



75.    In fact, CFO Justin Farry confirmed three months ago that E2 is currently in the process of commercialization:

76.    E2's current activities thus do not fall within the statutory safe harbor, and its responses to Angio's cease-and-desist letters appear to be a stall tactic.

---

[6] https://www.prnewswire.com/news-releases/endovascular-engineering-announces-dual-late-breaking-presentations-at-sir-and-scai-2026-highlighting-validation-of-blood-return-and-comprehensive-engulf-study-results-302718198.html

## COUNT I
### Infringement of U.S. Patent No. 8,613,717

77.     All foregoing allegations are incorporated by reference as if fully set forth here.

78.     Defendant E2 has directly infringed and continues to directly infringe the '717 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, and/or selling in the United States, or importing into the United States, products that satisfy each and every limitation of one or more claims of the '717 Patent, including at least the Accused Product. The Accused Product is identified based on publicly available information, and Angio reserves the right to identify additional infringing activities, evidence, and products on the basis of information obtained, for example, during discovery.

79.     For example, the Accused Product infringes at least claim 15 of the '717 Patent, as set forth in Exhibit 4.

80.     E2's infringement of the '717 Patent has been deliberate, willful, and knowing, entitling Angio to treble damages. E2 has had actual knowledge of the '717 Patent since at least March 7, 2024, when it was identified in a letter sent by Angio's counsel to Mike Rosenthal, then-CEO of E2.

81.     Further, E2 has engaged in deliberate and willful behavior with knowledge of the '717 Patent because it was twice identified as prior art during the prosecution of E2's own patents: U.S. Patent Nos. 12,053,192 and 12,076,036. Among other inventors, these patents both identify Scott Baron (CTO) and Mike Rosenthal (now-COO) as inventors.

82.    Angio has complied with the requirements of 35 U.S.C. § 287 to the extent applicable to the '717 Patent. *See* https://www.angiodynamics.com/about-us/intellectual-property/.

83.    Angio has suffered and continues to suffer damages as a direct and proximate result of E2's direct infringement of the '717 Patent in an amount to be proven at trial.

<u>**COUNT II**</u>
**Infringement of U.S. Patent No. 11,589,880**

84.    All foregoing allegations are incorporated by reference as if fully set forth here.

85.    Defendant E2 has directly infringed and continues to directly infringe the '880 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, and/or selling in the United States, or importing into the United States, products that satisfy each and every limitation of one or more claims of the '880 Patent, including at least the Accused Product. The Accused Product is identified based on publicly available information, and Angio reserves the right to identify additional infringing activities, evidence, and products on the basis of information obtained, for example, during discovery.

86.    For example, the Accused Product infringes at least claims 1 and 12 of the '880 Patent, as set forth in Exhibit 5.

87.    E2's infringement of the '880 Patent has been deliberate, willful, and knowing, entitling Angio to treble damages. E2 has had actual knowledge of the '880 Patent since at least March 7, 2024, when Angio sent a detailed notice letter to E2's counsel identifying the '880 Patent and informing E2 that its Hēlo Thrombectomy System infringes one or more claims

of the patent. On June 5, 2024, Angio sent a follow-up letter providing E2 with a detailed claim chart demonstrating how the Hēlo Thrombectomy System practices the claims of the '880 Patent.

88.     E2 has engaged in deliberate and willful behavior with knowledge of the '880 Patent because E2's own patent—U.S. Patent No. 12,440,615—identifies ten patents or published applications owned by Angio. Among these identified references is U.S. Patent No. 8,734,374, which is a parent to the '880 Patent. Further, E2's '615 Patent identifies a video for the AngioVac that demonstrates various aspects of the technology.

89.     Angio has complied with the requirements of 35 U.S.C. § 287 to the extent applicable to the '880 Patent. *See* https://www.angiodynamics.com/about-us/intellectual-property/.

90.     Angio has suffered and continues to suffer damages as a direct and proximate result of E2's direct infringement of the '880 Patent in an amount to be proven at trial.

**COUNT III**
**Infringement of U.S. Patent No. 12,496,077**

91.     All foregoing allegations are incorporated by reference as if fully set forth here.

92.     Defendant E2 has directly infringed and continues to directly infringe the '077 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, and/or selling in the United States, or importing into the United States, products that satisfy each and every limitation of one or more claims of the '077 Patent, including at least the Accused Product. The Accused Product is identified based on publicly available information, and Angio reserves the right to identify additional infringing activities, evidence, and products on the basis of information obtained, for example, during discovery.

93.    For example, the Accused Product infringes at least claims 1, 9, and 14 of the '077 Patent, as set forth in Exhibit 6.

94.    E2's infringement of the '077 Patent has been deliberate, willful, and knowing, entitling Angio to treble damages. E2 has had actual knowledge of the '077 Patent since at least December 19, 2025, when Angio sent a detailed notice letter to E2's counsel. That letter informed E2 that the USPTO had recently issued the '077 Patent and that E2's Hēlo Thrombectomy System infringes one or more claims of the '077 Patent. The letter further included a claim chart demonstrating how the Hēlo Thrombectomy System practices the claims of the '077 Patent.

95.    E2 has engaged in deliberate and willful behavior with knowledge of the '077 Patent because E2's own patent—U.S. Patent No. 12,440,615—identifies ten patents or published applications owned by Angio. Among these identified references is U.S. Patent App. No. 2025/0143729, which is in the same family as the '077 Patent. Further, E2's '615 Patent identifies a video for the AngioVac that demonstrates various aspects of the technology.

96.    Angio has complied with the requirements of 35 U.S.C. § 287 to the extent applicable to the '077 Patent. *See* https://www.angiodynamics.com/about-us/intellectual-property/.

97.    Angio has suffered and continues to suffer damages as a direct and proximate result of E2's direct infringement of the '077 Patent in an amount to be proven at trial.

## **JURY TRIAL DEMANDED**

98.    Angio respectfully requests a jury trial on any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Angio respectfully requests that the Court enter judgment for Plaintiff and pray that the Court grant the following relief to Plaintiff:

A.   A judgment that Defendant E2 has directly infringed one or more claims of the '717, '880, and '077 Patents;

B.   An award of damages adequate to compensate for E2's infringement of the Asserted Patents, including, but not limited to, lost profits and/or a reasonable royalty;

C.   An award of damages for pre-issuance infringement activities under 35 U.S.C. § 154(d);

D.   A preliminary and permanent injunction barring E2 and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with E2, and its parents, subsidiaries, divisions, successors, and assigns, from further acts of infringement of the Asserted Patents;

E.   A judgment that E2's infringement of the Asserted Patents was and continues to be willful;

F.   An award of treble damages under 35 U.S.C. § 284;

G.   A declaration that this case is exceptional under 35 U.S.C. § 285 and an award of Plaintiff's attorneys' fees and costs;

H.   An award of pre-judgment and post-judgment interest as provided by law; and

I.   Such other further relief to which Plaintiff may be entitled or as the Court may deem appropriate.

-26-

CONNOLLY GALLAGHER LLP

OF COUNSEL:

Danielle Vincenti Tully
Michael B. Powell
John T. Augelli
Michael A. Russo
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
dtully@orrick.com
mpowell@orrick.com
jaugelli@orrick.com
mrusso@orrick.com

Dated: April 23, 2026

/s/ Alan R. Silverstein
Arthur G. Connolly, III (#2667)
Alan R. Silverstein (#5066)
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
asilverstein@connollygallagher.com

*Attorneys for Plaintiff*
*AngioDynamics, Inc.*